Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 8295 | **DATE** | 6/7/2000 |
| **CASE TITLE** | Martyne vs. Parkside Medical Services | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. For the reasons set forth on the attached order, the Court's order is vacated insofar as it stated that defendant's motion to alter or amend the judgment was granted. Defendant's motion for entry of judgment as a matter of law is denied. Defendant's motion for a new trial is denied. Defendant's motion to alter or amend the judgment is granted in part and denied in part. Plaintiff's motion for an award of front pay is denied. Plaintiff's motion for an award of prejudgment interest is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | number of notices | Document Number |
| | No notices required. | | JUN 0 8 2000 | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | 00 JUN -7 PM 2:36 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MAUREENA MARTYNE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 97 C 8295 |
| | ) | |
| PARKSIDE MEDICAL SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
JUN 08 2000

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The jury in this case returned a verdict in favor of plaintiff Maureena Martyne on her claim under the Americans With Disabilities Act, 42 U.S.C. §12112(a), that defendant Parkside Medical Services had discriminated against her by failing to accommodate her disability. The jury awarded Martyne back pay of $302,000 and compensatory damages of $302,000. Parkside has moved under Fed. R. Civ. P. 50(b) for entry of judgment in its favor as a matter of law or alternatively for a new trial. Parkside has also moved under Fed. R. Civ. P. 59(e) to alter or amend the judgment to reduce it by the amount of disability benefits Martyne received from various sources, to reduce the compensatory damages award to the maximum allowed by law, and to further reduce that award as excessive. Martyne has moved for an award of front pay and prejudgment interest, and for attorney's fees and expenses.

Before the Court addresses these motions, it must correct some errors relating to the entry of judgment. The judgment originally entered by the Clerk incorrectly stated that plaintiff had been awarded damages of $302,000. When this came to the Court's attention, the Court directed

the Clerk to correct the judgment to reflect that the damage award was actually $604,000. However, in correcting the judgment, an order was erroneously entered stating that the "[m]otion by [defendant] to amend or alter judgment is granted." *See* Order of Feb. 22, 2000. That entry was incorrect; the Court had not yet considered Parkside's motion to alter or amend the judgment and did not intend to rule on it at that time. For this reason, the Court vacates the order of February 22, 2000 insofar as it stated that defendant's motion to alter or amend the judgment was granted.

A.    **Defendant's motion for judgment as a matter of law**

1.    **Issues relating to proof of plaintiff's disability**

The ADA provides that an employer may not discriminate against "a qualified individual with a disability" because of the person's disability; the term "discriminate" includes the failure of the employer to make reasonable accommodations to "the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. §§12112(a) & (b)(5)(A).

A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8). The term "disability" is defined as including "a physical or mental impairment that substantially limits one or more of the major life activities" of the employee. 42 U.S.C. §12102(2)(A). EEOC regulations interpreting the ADA define "major life activities" as including the function of working. 29 C.F.R. §1630.2(i). Being "substantially limited" in the major life activity of working requires that a person be "significantly restricted in the ability to perform either a class of jobs or a broad range

2

of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. §1630.2(j)(3)(i). The Seventh Circuit has held that "'an inability to perform a particular job for a particular employer'" is not sufficient to establish a substantial limitation on the ability to work; rather, "'the impairment must substantially limit employment generally.'" *Patterson v. Chicago Association for Retarded Citizens,* 150 F.3d 719, 724-25 (7th Cir. 1998) (quoting *Byrne v. Board Of Education,* 979 F.2d 560, 565 (7th Cir.1992)).

Parkside argues that Martyne failed to prove: 1) that she was "substantially limited" in working at the time she requested accommodation; 2) that she was precluded from a class of jobs or a broad range of jobs in various classes; or 3) that Parkside was aware of her alleged disability, or of a substantial limitation in her ability to work, at the time she requested accommodation.

In challenging the jury's verdict, Parkside bears a heavy burden. The Court may overturn the verdict only if no rational jury could have found for Martyne, even when the evidence is viewed in the light most favorable to her. *See Collins v. Kibort,* 143 F.3d 331, 335 (7th Cir. 1998). The Court does not substitute its judgment for that of the jury but rather determines only whether there was sufficient evidence upon which any rational jury could have reached the verdict. *See Tincher v. Wal-Mart Stores, Inc.,* 118 F.3d 1125, 1129 (7th Cir.1997).

Martyne has a master's degree in clinical psychology and is a trained counselor in the field of alcohol and chemical dependency and the treatment of "dual diagnosis" patients (those with a substance dependency as well as a psychiatric disorder). She was hired by Parkside as a counselor in 1986. In March 1992, Martyne transferred to the Independent Living Program, which involved patients with alcohol and substance dependency, many of whom were dual diagnosis patients. When she interviewed for this position, Martyne advised Parkside that she

3

was in recovery from alcoholism, an eating disorder, and being a victim of incest.

In the Independent Living Program, Martyne counseled patients and made records of her work and the patients' progress. Martyne also attended regular staff meetings called "staffings" at which the counselors would discuss their patients. Through June 1992, Martyne performed well as a counselor. But from June through at least September 1992, Martyne was subjected to verbal abuse by a co-worker named Michael Pakis who had learned that he was dying of AIDS and was under significant stress. The abuse was personal and repeated, and it continued despite the efforts by supervisory staff to counsel Pakis.

Martyne had suffered from depression since childhood, probably stemming in significant part from sexual abuse she suffered as a child. She had undergone care by psychiatrists since that time for depression and eventually for substance abuse. Prior to June 1992, Martyne's depression was under control through counseling. But there was evidence from which a rational jury could have concluded that Pakis' abuse triggered an intense psychological reaction in Martyne and precipitated a recurrence of serious depression. The evidence reflected that Martyne's performance on the job began to suffer in the summer of 1992 and that she became more and more withdrawn, anxious, and unable to interact with others. She was hospitalized for depression and stress in early October 1992 and then returned to work. Martyne testified that before and after her hospitalization, she requested accommodations from Parkside that she believed would allow her to deal with her emotional and psychological downturn and remain a fully productive member of Parkside's counseling staff. Among other things, she requested to change her schedule from five days per week to four (with extra hours on each day) so that she could undergo additional psychiatric counseling, as well as a shift in her caseload. We will

4

discuss the evidence regarding Martyne's accommodation requests in greater detail later in this decision. *See infra* at 11-12. At this juncture, it should suffice to say that Martyne testified that Parkside turned down these requests for accommodation several times in August through October 1992.

There was evidence indicating that Martyne continued to deteriorate following her return to work in October after her hospital stay. In late December, she went on medication for her depression, which had to be increased several times in order to be effective. She testified that the medication had serious side effects, causing severe headaches, problems with her vision, fatigue, and twitching. She also had continued difficulty concentrating and staying focused. Martyne was again off work for a week in January 1993 due to feelings of being overwhelmed. Though her depression improved somewhat in January 1993, in late January a performance evaluation covering the period from September through January noted a number of deficiencies, including making the necessary records of her work with patients. The evaluation also stated that Martyne "has openly discussed being overwhelmed professionally and feeling stressed which is reflected in her personal work environment." Tr. 151. In February 1993, Martyne testified, her supervisors told her that if she did not catch up with her patient charts, further action would be taken against her. In early February, some patients were reassigned to Martyne from another counselor who was transferred out of the unit, and these were patients who required increased attention because they had been transferred among several counselors over the preceding months. Martyne became unable to cope with working and requested a leave of absence on February 25, 1993; she was unable to return to work after that.

Parkside argues that the evidence failed to establish that Martyne had a "disability"

within the meaning of the ADA. The Court disagrees. There was testimony from both Martyne and her psychiatrist, Dr. Joanne Parks, that Martyne suffered from depressive disorder, a mental illness. Martyne had suffered from this illness since she was a child and had been treated for it for many years. The regulations interpreting the ADA include mental illness as an example of an "impairment" for purposes of the ADA. *See Patterson,* 150 F.3d at 725; 29 C.F.R. §1630.2(h)(2).

Parkside argues that Martyne failed to prove that she actually "had the mental condition of depression" or that it limited her ability to work during the relevant period. Parkside cites a letter from Martyne's treating psychiatrist, Dr. Kenith Robins, allowing her to return her to work in October 1992; Parkside argues this is "uncontroverted medical evidence" that she had no work-related limitations. Dfdt. Mem. at 3. The letter to which Parkside refers was provided by Dr. Robins to excuse Martyne's absence from work when she was hospitalized in early October 1992. It stated that Martyne had been hospitalized for stress, burn-out, and depression; it also stated that she would return to work on October 19, 1992 and that Dr. Robins would continue to see her as an outpatient. Two Parkside supervisors, Pauline Zoch and Margaret O'Hare, testified that they concluded from the letter that Martyne's ability to work was unaffected. Tr. 308-09, 342-43. But the jury, which was able to view the witnesses' demeanor, was not required to believe the testimony of Zoch and O'Hare on this score, particularly in view of the fact that they never communicated to Martyne that they viewed her doctor's letter as establishing that she was fully able to work and required no accommodations. In any event, the letter, which was only a few sentences long, cannot be construed as "uncontroverted medical evidence" that Martyne had completely returned to normal, that her ability to work was unaffected, or that no

accommodations were required. That simply was not the purpose for which the letter was provided. And because Dr. Robins was not called to testify by either side, there is no basis on which to conclude what his opinion was or would have been on these topics. If anything, the letter is evidence that Martyne *did* have a mental condition -- as Dr. Robins reported that she was suffering from depression and had been hospitalized for this condition.

Parkside also introduced a letter from Dr. Robins dated January 15, 1993 stating that Martyne was under his care and asking to excuse her from work on January 14 and 15, and a final letter from Dr. Robins and Dr. Bennett Braun dated January 20, 1993, stating that Martyne was unable to work from January 14 through 20 "due to feelings of being overwhelmed" and that "[s]he is in need of continued treatment to further her recovery" but would be able to return to work as of January 20. Again, the fact that a doctor sent a letter saying Martyne was able to work cannot, without more, be considered to have established beyond dispute that her ability to work was unaffected. In any event, by January Parkside had already refused Martyne's requested accommodations more than once. *See infra* at 11-12.

Parkside seems to argue that Martyne was required to introduce medical testimony directly establishing that her condition substantially limited her ability to work. Dfdt. Mem. at 3-4. But it has cited no decision by the Seventh Circuit requiring testimony from a medical professional to establish the existence of the plaintiff's disability in an ADA case. And none of the cases cited by Parkside from other districts and circuits hold that medical testimony is required in all cases. Rather, these were cases in which the absence of testimony by a medical professional was significant because there was no objective manifestation of the plaintiff's disability; the proof of disability consisted entirely of the plaintiff's say-so. *See Heilweil v.*

*Mount Sinai Hospital,* 32 F.3d 718, 723 (2d Cir. 1994) (plaintiff with asthma whose claim that

she could not work in any poorly ventilated place was supported only by her own testimony);

*Taylor v. Dover Elevator Systems, Inc.,* 917 F. Supp. 455, 460-61 (N.D. Miss. 1996) (plaintiff

whose unsupported claim of side effects from epilepsy medication was contradicted by his

failure to report any such effects to his treating doctor); *Farley v. Gibson Container, Inc.,* 891 F.

Supp. 322, 326 (N.D. Miss. 1995) (decided by the same judge as *Taylor;* plaintiff with subjective

claim of pain resulting from previous surgery). In such circumstances, the courts were looking

for medical testimony in order to provide some corroboration for the testimony of a lay plaintiff

who introduced no objective evidence substantiating his or her claim. Indeed, in *Farley,* what

the court said was that there were "no medical reports *or other objective evidence* substantiating

his claim." *Id.* (emphasis added).

Here, by contrast, there *was* objective evidence supporting Martyne's testimony about her

condition and symptoms. Two of her co-workers testified regarding their observations of the

change in Martyne's condition in the late summer and fall of 1992. Gretchen Torstensson stated

that she had observed Martyne at staffings in 1990 and 1991 and had a positive assessment of her

capabilities at that time. Tr. 24. But in the fall of 1992, when Torstensson worked in the ILP

along with Martyne, she said that Martyne seemed to be "out of it"; later, when Torstensson had

occasion to review Martyne's patient charts from this period, she observed that "nothing had

been done" by Martyne on the charts starting in June or July 1992. Tr. 33. Kathleen Corcoran,

a supervisor, testified that after she returned to work in the latter part of August 1992, she noticed

a marked difference in Martyne: among other things, during staffings, Martyne acted "like a

battered woman," cringing in her chair with a heightened startle response. Tr. 64-66. In early

8

September, Corcoran saw Martyne at a staffing and testified that she "looked stunned" and seemed to be in a self-protective mode. Tr. 71. Finally, Martyne was hospitalized for depression in October 1992; this also provides some corroboration of the existence of a disability.[1]

Finally, assuming medical testimony was necessary, Martyne offered such testimony through Dr. Joanne Parks. Though Dr. Parks had not treated Martyne during 1992, she made a retrospective assessment of Martyne as part of her later treatment. Dr. Parks testified that as of September 1992 Martyne's coping skills had dissolved, she had trouble concentrating, eating and sleeping, she felt depressed, and she was experiencing flashbacks and nightmares. Tr. 254. Dr. Parks stated that Martyne suffered from depressive disorder as well as other conditions, including post-traumatic stress disorder. Tr. 253. All of this corroborated Martyne's own testimony regarding her condition and symptoms at the relevant periods.

In sum, this is not a case in which the jury had only the plaintiff's say-so regarding the existence of a disability. There was evidence of objective manifestation of her disability and the way in which it affected her ability to work. Martyne provided sufficient evidence from which a jury could conclude that she suffered from a disability within the meaning of the ADA at the times she requested accommodation.

Parkside argues that the evidence did not establish that Martyne's impairment "substantially limited" her in the major life activity of working at the times she requested accommodation. It contends that the testimony about Martyne's symptoms did not rise to the

---

[1] Though Parkside may be correct that evidence that the plaintiff was hospitalized does not demonstrate the existence of a disability within the meaning of the ADA, *see* Dfdt. Mem. at 4-5 (citing cases), here there was more.

level of a substantial limitation and that there was no evidence that she was precluded from a broad class of jobs, or many jobs. Rather, Parkside argues, Martyne showed at most that she was unable to perform the particular job that she held, in which she had to interact with Pakis. Dfdt. Mem. at 5-6; *see, e.g., Weiler v. Household Finance Corp.,* 101 F.3d 519, 524-25 (7th Cir. 1996).

The Court believes that Martyne presented evidence sufficient for a reasonable jury to find in her favor on this point. She showed that at the relevant time, she was severely limited in her ability to concentrate and interact with others and in being able to communicate (in writing or otherwise) her interactions with patients. The jury reasonably could have concluded that these were essential functions of counseling positions generally, and not just of Martyne's particular position at Parkside. Though it is true that Martyne did not offer evidence *directly* establishing that she was precluded from a broad range of jobs, Parkside cites no case requiring expert testimony along these lines or eliminating a plaintiff's ability to prove this element circumstantially. Parkside did not object to the Court's instruction to the jury that it was to consider both direct and circumstantial evidence and could give equal weight to both. *See* Tr. 428-29. The evidence regarding Martyne's symptoms and the effect of her mental condition on her ability to perform the essential functions of a counselor's job was sufficient to permit a jury to conclude that her disability substantially limited her in connection with any sort of counseling job, not just the particular position she held with defendant. *Cf. Patterson,* 150 F.3d at 725 (plaintiff worked and had been trained as a teacher; ADA regulations' reference to a "class of jobs" required examination of whether plaintiff was limited from working in the teaching profession generally, rather than just in the particular teaching job she held); *Davidson v.*

10

*Midelfort Clinic, Ltd.,* 133 F.3d 499, 506-07 (7th Cir. 1998) (plaintiff was psychotherapist;

defining relevant class of jobs as psychotherapy jobs); *Heilweil,* 32 F.3d at 724 (plaintiff worked

as an administrator; relevant inquiry was whether plaintiff was substantially limited in working

in the general field of administration). In sum, viewing the evidence in the light most favorable

to Martyne, this was not a case in which she was shown simply to have been unable to get along

with a particular co-worker. Rather, the evidence supported her contention that though the

recurrence of her disability may have been prompted by the actions of a co-worker, she in fact

had a disability as the ADA defines that term, and not just a problem working with Pakis, at the

times she sought accommodation in 1992. *Compare Schneiker v. Fortis Insurance Co.,* 200 F.3d

1055, 1062-63 (7th Cir. 2000) (employee showed only that she could not work for a particular

supervisor; evidence showed that once away from that supervisor, her job performance was up to

par).

Finally, the evidence was sufficient to permit a rational jury to find that Parkside, and

specifically Martyne's supervisors, were aware of her disability at the time she sought

accommodation. Martyne testified that in August 1992, she told Pauline Zoch that she could not

handle her work situation and was having a difficult time functioning; she told Zoch that she was

having problems with depression and was seeing a counselor, and that it was affecting her care of

patients. Tr. 121-22. Martyne testified that she told her supervisor Kathleen Corcoran (who

testified that she in turn told Margaret O'Hare) in August that she was becoming more depressed

and was being counseled for depression, stress, and feeling overwhelmed. Martyne said that she

could not get the help she needed by going to counseling just once a week and that she needed

more counseling to avoid hospitalization. Tr. 124, 126. In September 1992, Martyne said, she

11

spoke directly with O'Hare, told her of her problems with depression, and asked to work a four

day schedule with increased daily hours rather than five days per week so that she could see her

counselor on Friday and could have that day off to recuperate emotionally and physically. Tr.

126-27. She also testified that she asked O'Hare, who was in the process of reassigning patients,

to change her caseload so that she did not have all "dual diagnosis" patients, who were more

difficult to handle. O'Hare said that she would check with Zoch. Tr. 127-28. O'Hare later

reported back to Martyne, telling her that her requests had been rejected and that she could not let

her treatment interfere with her work schedule. Tr. 128. When she was hospitalized for

depression in early October, Martyne said, she called Zoch from the hospital and again requested

these same sorts of accommodations, as well as separation from Pakis. Tr. 131-33. But no

accommodations were provided. Tr. 133.

     Zoch and O'Hare denied these conversations, but the jury was entitled to believe

Martyne's testimony over theirs and specifically to disbelieve their denials of awareness that

Martyne suffered from a disability. And indeed Zoch – the supervisor whom Martyne had called

from the hospital – admitted that she was "concerned" after receiving Dr. Robin's letter in early

October 1992 indicating that Martyne was still being treated for depression, stress, and burnout,

though she denied that she had discussed these subjects with Martyne. Tr. 355-56. O'Hare

likewise admitted that she realized Martyne's problems were affecting her job. Tr. 317. Both

O'Hare and Zoch conceded they knew Martyne was depressed, was hospitalized for depression

and stress, and was being treated for this on an ongoing basis, and they recognized her work had

suffered, but they tried to draw a fine line between that knowledge and knowledge that Martyne

had a "disability" or that she suffered from "clinical depression." The jury was not required to

believe them and was entitled to believe Martyne on this score.

### 2. Issues relating to alleged failure to accommodate

Parkside argues that the evidence demonstrated that it provided Martyne with the reasonable accommodations she requested. The Court disagrees. Assuming the jury believed Martyne, as it was entitled to do, it rationally could have found that Martyne requested quite modest accommodations as early as August - September 1992 (changing from a five-day to a four-day schedule and some shifting of patient assignments) and that she was turned down flat. Based on this testimony, the jury reasonably could have found that Parkside failed to engage in the "interactive process" mandated by the ADA when a disabled employee requests accommodation. *See, e.g., Beck v. University of Wisconsin Board of Regents,* 75 F.3d 1130, 1135-36 (7th Cir. 1996). Though Parkside eventually agreed in January 1993 to allow Martyne to follow a four day schedule (by using her vacation time) – after it had turned down her first several requests along these lines – the jury reasonably could have found that this was too late for the change to do any good.

A rational jury also could have concluded that Parkside's unwillingness to make shifts in patient assignments constituted an unlawful failure to provide reasonable accommodations. There was no indication Martyne was uniquely qualified among the counselors to handle dual-diagnosis patients or that the other counselors were not qualified to do so. And the evidence reflected that patients were shifted by Parkside from time to time – for example, on occasions of counselor turnover – and the evidence provided no basis to believe that making the shift that Martyne requested would have caused undue hardship to Parkside.

Finally, the jury reasonably could have concluded that Parkside's failure to make these

13

accommodations in timely fashion would have enabled Martyne to remain able to work as a counselor. We discuss the evidence in this regard in greater detail in the next section of this decision.

### 3. Issues relating to damages

The evidence showed that Martyne has been unable to work since late February 1993. Under ordinary circumstances, this would preclude her from obtaining back pay after that date. *Flowers v. Komatsu Mining Systems, Inc.,* 165 F.3d 554, 557-58 (7th Cir. 1999). The evidence, however, supported the jury's conclusion that Martyne's inability to work was caused by defendant's failure to provide her with reasonable accommodation for her disability. Martyne testified, and a rational jury could have believed, that her illness had always been controlled and was controllable through psychiatric treatment. The evidence also showed that Parkside was unwilling to permit Martyne to have even a minimal amount of flexibility in her schedule to allow her to obtain additional counseling, and that it was unwilling to work with her to attempt to shift her patient load to reduce, even temporarily, the extra stress imposed on her by dealing with a large proportion of dual diagnosis patients. The evidence reflected that Martyne's condition deteriorated significantly over the period in which she requested and was refused these modest accommodations, a period during which there was no evidence of further altercations between Martyne and Pakis. From all of this a rational jury could have inferred that if defendant had not flatly turned down Martyne's request for accommodation, she would have improved or at least stabilized and that because of Parkside's conduct she instead continued to deteriorate, until she reached a point at which recovery (in the sense of returning her to the ability to work) became effectively impossible.

14

Because Martyne's inability to work was shown to be caused by Parkside's failure to accommodate her disability, to preclude Martyne from a back pay award following February 25, 1993 would reward Parkside for its violation of the ADA. The Court declines Parkside's request to set aside the back pay award.

Finally, we disagree with Parkside's contention that the compensatory damage award had no rational connection with the evidence. As in *EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1285-86 (7th Cir. 1995), Martyne's work was a very large part of her life; when she became unable to work, she was "cut off from one of the major defining aspects of [her] life." *Id.* As Martyne testified,

> My job gave me a reason to live, a reason to feel productive and worthwhile, I felt that I was a contributing member to society and I could help other people who had been hurt, to have a better quality of life for them. That's where I got my self-respect, and that's where I felt like I could go ahead and survive my own personal experiences and make something productive out of my life. Tr. 165.

The jury rationally could have concluded that the value of Martyne's loss of her capacity to work, together with the emotional distress caused by Parkside's violation of the ADA, was roughly equivalent to her loss of back pay up to the time of trial. There is no requirement that such damages be established with precision.

### 4.    Conclusion

For the foregoing reasons, defendant's motion for entry of judgment in its favor as a matter of law is denied.

## B.    Defendant's motion for new trial

Parkside argues that the Court should grant it a new trial because the verdict was against the manifest weight of the evidence and the damages were excessive.

15

As long as there is a reasonable basis in the record supporting the jury's verdict, it should not be overturned. *See, e.g., Robinson v. Burlington Northern R. Co.,* 131 F.3d 648, 656 (7th Cir. 1997); *Eastern Natural Gas Corp. v. Aluminum Co. of America,* 126 F.3d 996, 1000 (7th Cir. 1997). Granting a new trial on the grounds that the verdict is against the weight of the evidence is proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict cries out to be overturned or shocks the conscience. *Latino v. Kaizer,* 58 F.3d 310, 315 (7th Cir. 1995). The Court cannot say that this is the case here. The evidence reflected that Martyne's pleas for accommodation were ignored for three months, and perhaps longer. In view of the nature of her disability, this delay was critical; if not dealt with promptly, Martyne risked being thrown into a downward spiral. But rather than extending to Martyne a helping hand, by their silence her supervisors told her to grin and bear it. As administrators of a program whose mission was to help those with serious emotional problems, Parkside's personnel should have known better.

Nor can the Court say that the damages were excessive. The back pay award was entirely consistent with the evidence. Though the fact that the compensatory damage was identical in amount to the back pay award might cause one to initially raise an eyebrow, as we have indicated, it was not irrational for the jury to conclude that the loss of Martyne's ability to work and her future earning capacity was an injury roughly equivalent to the seven-year loss of a job that she had experienced prior to the time of trial.

Parkside also argues that the Court erred in permitting Martyne to call Dr. Joanne Parks to testify and that this error rendered the trial unfair. Parkside contends that based on answers to interrogatories submitted by Martyne, Parkside had no reason to believe that Dr. Parks would be

called to testify and thus did not take her deposition or obtain countervailing medical testimony. But in the context of the trial, this argument came out almost as an afterthought. The Court's pretrial order requirements directed each party to list its witnesses and set forth in writing any objection to the calling of any witness. *See* Final Pretrial Order, p. 2, ¶2(b). The pretrial order in this case was prepared following the Court's January 10, 2000 denial of Parkside's summary judgment motion and was submitted to the Court on January 31, 2000. Though Parkside objected to the calling of Dr. Parks, its sole objection was that her testimony was not relevant and unfairly prejudicial because she had not treated Martyne during the period in question. *See* Final Pretrial Order, p. 7. This objection was also embodied in a motion *in limine* filed by Parkside which the Court denied after hearing argument at the final pretrial conference. *See* Order of Feb. 4, 2000. Nothing was said in that motion *in limine,* or elsewhere in the pretrial order, to suggest that Parkside had been taken by surprise by the listing of Dr. Parks as a witness.

Following the denial of its motion *in limine,* on the first day of trial Parkside made a second objection to the calling of Dr. Parks. Parkside did not argue that plaintiff should be barred from calling Dr. Parks because she had not been disclosed as a trial witness; rather, its argument was that Dr. Parks was being called as an expert and that plaintiff had failed to comply with Fed. R. Civ. P. 26(a)(2), which requires the submission of a report detailing the expert's findings. The Court heard extended argument on this motion; at no time did Parkside suggest that it had been taken by surprise by the fact that Dr. Parks had been listed. Following argument, the Court concluded that Rule 26(a)(2)'s report requirement applies only to expert witnesses retained for purposes of the litigation, and not to treating physicians like Dr. Parks. The Court therefore ruled that to the extent Dr. Parks was being called in her capacity as a treating doctor,

17

plaintiff's failure to provide a Rule 26(a)(2) expert report did not affect her ability to testify. The Court agreed with defendant, however, that Dr. Parks should not be permitted to go beyond the observations, conclusions, and opinions she had reached as a treating doctor, and therefore ruled that before Dr. Parks (who had not begun to treat Martyne until a significant period after the events at issue in the case) could testify retrospectively about Martyne's condition at the time of the relevant events, an offer of proof outside the jury's presence would be required in order to determine whether Dr. Parks had reached retrospective conclusions during, and as part of, her treatment of Martyne. *See* Tr. 52-54. Following the offer of proof, the Court concluded that Dr. Parks had in fact done so and therefore could testify regarding those conclusions. Tr. 230-32.

It was only after making and losing its written motion *in limine,* and making and losing (in part) its oral motion, that Parkside for the first time raised the issue upon which it now relies in seeking a new trial; namely that it was misled by Martyne's interrogatory answers to believe that Dr. Parks would not be called at all, not even as a treating doctor. Tr. 232-33. The interrogatory in question asked plaintiff to identify "every individual whom you expect to call as an expert witness, at trial," and to provide further information for each such person. *See* Dfdt's Mem., Ex. A, Interrogatory 3. In response to this interrogatory, Martyne's counsel identified Dr. Parks, as well as other persons who had treated plaintiff for physical and psychological conditions. *Id.* The answer stated that plaintiff "has made no decision regarding which expert/opinion witnesses will be called at trial," that the listed persons "are potential expert/opinion witnesses," and that the further information requested by defendant would be supplied "when a decision is made concerning whether the witness will be called at trial." *Id.* However, plaintiff never provided any further information. Defendant did not take Dr. Parks'

deposition and did not retain a counter-expert to testify at trial. Martyne's counsel argued that they had construed the interrogatory as seeking disclosure of retained experts, not treating doctors, and once they had concluded that Dr. Parks would testify only as a treating doctor, they felt no need to make further disclosures in response to the interrogatory. Tr. 235.

Upon inquiry by the Court, Parkside's counsel stated that despite its claim of surprise, it had subpoenaed and obtained records from Dr. Parks. Tr. 237-39. For this reason, and based on the history and genesis of Parkside's argument, the Court did not conclude at the time, and cannot now conclude, that Parkside has shown that it was unfairly surprised. If Parkside in fact had been surprised by the very listing of Dr. Parks as a witness, one would have expected such a claim to have been made at the time the pretrial order was filed. This argument was not one whose factual basis arose only after, or based upon, the Court's other rulings about Dr. Parks. Rather, it was an argument available to Parkside all along. Parkside's failure to make the argument at the time the final pretrial order was filed -- when it was under a specific directive from the Court to set forth any objections that it had to the calling of any witnesses – constituted a waiver of its current argument or, if not a waiver, is and was a good reason for the Court to reject Parkside's claim of unfair surprise. If Parkside had made this argument at the time of the pretrial order, the Court would have had the option of delaying the trial so that Parkside could take Dr. Parks' deposition; but with the argument of unfair surprise being made for the first time during trial, this relief was not available as a practical matter (and was not requested by Parkside in any event).

In addition, the Court does not believe that Parkside was unfairly prejudiced by Dr. Parks' testimony. The Court's limitation of the subjects of her testimony kept the testimony

19

narrowly focused on her opinions regarding Martyne's mental condition in 1992-93. She did not render an opinion on what caused Martyne to deteriorate over that period – except in response to a question posed by defendant on cross-examination, when Dr. Parks stated that she believed that Martyne's post traumatic stress disorder resulted in part from events when she worked at Parkside. Tr. 269. In view of the Court's rejection of Parkside's argument that medical testimony was required, Dr. Parks' testimony may not even have been material or necessary to the verdict in this case.

For these reasons, the Court denies Parkside's motion for new trial.

## C.     Defendant's motion to alter or amend judgment

Parkside argues that the back pay award should be reduced by the amount of disability benefits Martyne received pursuant to a Parkside-financed plan, as well as by the amount of Social Security disability benefits she received, arguing that otherwise Martyne will receive a windfall. Martyne has agreed to the former reduction but objects to the latter. *Flowers v. Komatsu Mining Systems, Inc.,* 165 F.3d 554 (7th Cir. 1999), holds that disability benefits may be offset against a damage award pursuant to the collateral source rule. But the purpose of that rule is "'not to prevent the plaintiff from being overcompensated but rather to prevent the tortfeasor from paying twice.'" *Id.* at 558 (quoting *Perry v. Larson,* 794 F.2d 279, 286 (7th Cir. 1986)). Social Security disability benefits are payable only to persons who have contributed to the Social Security system; Martyne contributed to Social Security starting long before she was employed by Parkside. To the extent that refusing to offset the Social Security payments provides her with a windfall, "it is better to give the windfall to the victims of discrimination than the perpetrator." *EEOC v. O'Grady,* 857 F.2d 383, 389 (7th Cir. 1988). The Court

therefore denies Parkside's request to offset Martyne's Social Security Disability benefits. Martyne's other disability benefits will be offset against the back pay award, in the following amounts:

| Year | Amount |
|---|---|
| 1993-94 | $11,589.76 |
| 1994-95 | 18,348.00 |
| 1995-96 | 7,645.00 |
| Total | $37,582.76 |

The total amount of the back pay award is therefore reduced from $302,000 to $264,417.24. The judgment will be amended accordingly.

The Court also will amend the judgment to reduce the compensatory damages award to $300,000, the maximum permitted under 42 U.S.C. §1981a(b)(3)(D). Parkside's request to reduce the compensatory damage award is otherwise denied. *See* discussion *supra* at 14-15, 16.

**D.      Plaintiff's motion for an award of front pay and prejudgment interest**

Under the ADA, the Court may award a prevailing plaintiff front pay as an equitable remedy in a case in which reinstatement is inappropriate. *See Williams v. Pharmacia, Inc.,* 137 F.3d 944, 951-52 (7th Cir. 1998) (Title VII case); *Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1141 (7th Cir. 1994) (ADEA case). Front pay consists of a lump sum representing the discounted present value of the difference between the earnings the plaintiff would have received in her employment with the defendant and the earnings she can be expected to receive in her current and future employment. *McKnight v. General Motors Corp.,* 908 F.2d 104, 116 (7th Cir. 1990). In this case, Martyne is currently unemployable and is expected to remain that

21

way. She calculates that her salary with Parkside for the current year would be just short of $47,000 if she were still employed there and requests a front pay award based on this sum for the next five years.

The Court declines to award front pay in this case. Martyne is unable to work and thus reinstatement is not an available remedy. Her real claim is that she became unable to work as a result of defendant's actions. But as indicated earlier, the jury was instructed that plaintiff's alleged lost earning capacity was a component of compensatory damages, and the significant award that the jury made in this case can reasonably be assumed to have been intended to compensate Martyne for this (among other things). For this reason, the Court does not believe that an award of front pay is appropriate.

Plaintiff also requests an award of prejudgment interest on the back pay award. "Prejudgment interest . . . is a normal part of any award under federal law." *In the Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1331 (7th Cir. 1992). Without an award of interest, the back pay award would significantly undercompensate Martyne for the harm the jury concluded Parkside had caused to her. *Id.* The Court agrees with Martyne that some amount of prejudgment interest is appropriate.

However, the four year delay that occurred prior to the filing of Martyne's complaint in this case is completely unattributable to Parkside. Martyne filed her administrative charge of discrimination in May 1993. She did not file this lawsuit until September 1997. Though the lawsuit was timely filed within 90 days after Martyne received a "right to sue" letter from the EEOC, she could have requested a right to sue letter at any time after 180 days had passed from the filing of her charge. *See* 29 C.F.R. §1601.28(a)(1). The Court therefore will not award

22

interest for the period of time prior to the filing of this suit.

From September 1997 to the present, however, addition of prejudgment interest to the back pay award is appropriate and necessary in order to completely compensate Martyne. The Court believes that a market rate of interest during the period of the litigation is the appropriate rate to use. *See Amoco Cadiz,* 954 F.2d at 1332. The Court accepts plaintiff's proposal to use the prime rate. Interest should be calculated on the reduced back pay award from the end of each calendar year beginning at the end of 1997 based on the interest rate at the effect at each year's end. *See* Dfdt's Opposition to Pltf's Motion for Award of Front Pay, Exhibit 1 (table of interest rates). The Court directs the parties to provide the Court in seven days with a revised calculation of prejudgment interest in accordance with this ruling.

**E.     Plaintiff's motion for attorney's fees and expenses**

As the prevailing party in this case, Martyne is entitled to an award of her attorney's fees and expenses. *See* 42 U.S.C. §12117(a); 42 U.S.C. §2000e-5(k). Parkside has not objected to plaintiff's request for an award of attorney's fees in the amount of $78,488. The Court finds this amount to be reasonable and properly supported by plaintiff.

Parkside objects to Martyne's request for an award of expenses in the amount of $2,257.86 solely on the grounds that plaintiff failed to file a bill of costs within 30 days of entry of the judgment. Though it is true that plaintiff did not requests costs on the "bill of costs" form available from the Clerk, she did make and support a request for costs as part of her motion for attorney's fees, well within 30 days of both the original and amended judgment. Parkside was not prejudiced in any respect by plaintiff's failure to use the form supplied by the Clerk. Its objection to the request for an award of expenses is overruled.

23

## Conclusion

For the foregoing reasons, the Court's order of February 22, 2000 is vacated insofar as it stated that defendant's motion to alter or amend the judgment was granted. Defendant's motion for entry of judgment as a matter of law is denied. Defendant's motion for new trial is denied. Defendant's motion to alter or amend the judgment is granted in part; the back pay award is reduced to $264,417.24, and the compensatory damages award is reduced to $300,000, for a total of $564,417.24. Defendant's motion to alter or amend the judgment is otherwise denied. Plaintiff's motion for an award of front pay is denied. Plaintiff's motion for an award of prejudgment interest is granted in part and denied in part as stated above. On or before June 14, 2000, the parties are to present a revised prejudgment interest calculation as set forth above. Plaintiff's motion for attorney's fees and expenses is granted; the Court awards plaintiff attorney's fees in the amount of $78,488.00 and expenses in the amount of $2,257.86.

MATTHEW F. KENNELLY
United States District Judge

Date: June 7, 2000

24